UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOMEI SEH,

         Plaintiff,

    v.

NANCY A. BERRYHILL,

         Defendant.

Case No. 18-cv-00885-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

Plaintiff Lomei Seh ("Seh") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. [Docket No. 18 (Pltf. Mot.)] The Commissioner cross-moves to affirm. [Docket No. 19 (Def. Mot.)] For the reasons stated below, the court grants Seh's motion in part, denies the Commissioner's cross-motion, and remands this case for further proceedings.

## I.    PROCEDURAL HISTORY

Seh filed an application for Social Security Disability Insurance (SSDI) benefits on November 15, 2013, alleging a disability onset date of September 25, 2008.[1] Administrative Record (A.R.) 52, 172-73. Her application was initially denied on April 10, 2014 and again on reconsideration on September 24, 2014. A.R. 108-10, 115-20. On October 17, 2014, Seh filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 121-22. ALJ Serena S. Hong held a hearing on April 14, 2016. A.R. 47-69, 162-69.

After the hearing, ALJ Hong issued a decision finding Seh not disabled. A.R. 24-46. The

---

[1] Seh originally alleged a disability onset date of July 1, 2011, and later amended it to September 25, 2008. A.R. 52.

ALJ determined that Seh has the following severe impairments: fibromyalgia, thoracic outlet syndrome, and degenerative disc disease. A.R. 29. The ALJ found that Seh retains the following residual functional capacity (RFC):

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b), except the claimant cannot climb ladders, ropes, and scaffolds; can occasionally perform all other postural activities; frequently push and/or pull with the bilateral upper extremities cannot overhead reach with the bilateral upper extremities; can frequently reach in all other direction; and can frequently handle and finger.

A.R. 31. Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform Seh's past work as an attorney and realtor, the ALJ concluded that Seh is not disabled. A.R. 38-40. In the alternative, the ALJ found that Seh could perform a range of light exertional level work. A.R. 39.

The Appeals Council denied Seh's request for review on December 7, 2017. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Seh then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

---

[2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

1.    At the first step, the ALJ considers the claimant's work activity, if any.  If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Seh's Testimony

Seh was born on April 23, 1966 and was 49 years old at the time of the hearing.  A.R. 51.  She lives in San Rafael with her husband and two adopted children, who were 12 and 14 years old at the time of the hearing.  A.R. 51, 63.  She has long-term disability insurance through a private company.  A.R. 51.

Seh has a law degree and worked in the past as an attorney and a realtor.  A.R. 52, 55, 66.  She was self-employed as a realtor beginning in 2000 or 2001.  A.R. 55.  Between that time and

2008, she had the help of her mother-in-law, who was also in the realtor business, and who would help Seh whenever she was not well enough to work. A.R. 55. She returned to work as a realtor on a part-time basis between 2008 and 2010. A.R. 52.

Regarding her symptoms, Seh testified that she has a lot of pain whenever she uses her arms. A.R. 56. She can only write two or three sentences at a time and cannot type. A.R. 56. She cannot sit for long periods, and instead has to "get up and move around all the time or lie down." A.R. 56-57. Seh stated that her symptoms got "worse and worse" over the years, and her doctors "kept telling me that I had to stop working." A.R. 56. She testified that she did not stop working because her insurance company found that she was only partially disabled and required her to keep working in order to get any disability benefits, so she "had no other choice." A.R. 56. In 2011, her insurance company found her fully disabled and she stopped working completely. A.R. 56.

On a typical day, Seh gets up and gets her children ready for school. A.R. 57. As she cannot cook, her husband cooks the food for the children's lunches. A.R. 58. She oversees them while they cut their own food because it hurts too much for her to use a knife. A.R. 58. She puts the food in a container and makes sure the children have everything they need for school. A.R. 58. Seh drives them about five miles to school. A.R. 57. Afterwards, she goes for a walk and swings her arms, for "therapeutic reasons." A.R. 57. Then she goes home and does physical therapy prescribed by Dr. Edgelow, who she identified as the "preeminent specialist in thoracic outlet syndrome." A.R. 57.

Seh stated that she does some chores around the house. A.R. 59. She sometimes folds laundry, but the repetitive motion of her hands causes her a lot of pain and she has to stop after about five minutes. A.R. 59. After that, her back and arm start to hurt, or she suffers at the end of the day if she does anything with her hands. A.R. 60. Her husband does all the cooking in the house. A.R. 60. Her retired mother-in-law also comes and helps with household chores, and Seh has a cleaning person who comes twice a week. A.R. 59. Seh helps with other household chores, including "pick[ing] up a few things here and there if I'm walking through," wiping the counters, and loading and unloading the dishwasher. A.R. 60.

Seh's father has advanced Parkinson's disease and is in the hospital. A.R. 61. Seh oversees

4

his care, including fielding calls from people and "juggl[ing] everything." A.R. 61-62. She coordinates his care and instructs people on what to do. A.R. 62. She also helps her daughter, who has significant learning challenges, with her education. A.R. 62-63.

Seh testified that her pain symptoms have gotten worse, and that she is "able to do so much less." A.R. 60. She stated that she "sometimes get[s] frustrated because I might just – I can't handle any stress. Everything gets my nerves going. I just feel very fragile and I hate that. I hate being fragile." A.R. 61. She reported that she has tried mental health therapy in the past, but did not find it very helpful. A.R. 62. She tried antidepressants but stopped them due to unwanted side effects. A.R. 62. Seh does breathing exercises recommended by Dr. Edgelow. A.R. 62. She testified that there have been times when she thought she was having a heart attack from the stress and because thoracic outlet syndrome causes constriction of the nerves around the heart. A.R. 62. She has gone to the emergency room a "couple of times" when her symptoms got worse. A.R. 62. Seh testified that she used to see Dr. Edgelow in Fremont frequently, but it became too far to drive. A.R. 57. Similarly, Dr. Friedman in San Jose told her that it was killing her to drive that far and he could not see her anymore. A.R. 58. Dr. Friedman also told her that she needed to stop working. A.R. 58.

When asked whether she could do any jobs that were less skilled or less stressful, Seh responded, "I don't think so because I don't know what job . . . wouldn't require that I use my arms a lot and would allow me to get up and rest all the time." A.R. 63. She testified that she cannot work because she gets exhausted and easily riled, and she needs to physically lie down for several hours each day. A.R. 64. She stated that this pattern has continued for the past six or seven years. A.R. 64.

### B. Relevant Medical Evidence

#### 1. Treatment Records

In early 2002, Seh jumped off some stairs onto a sandy beach during a run. A.R. 260, 278-79, 294, 798. Subsequently, she began suffering from neck and back pain. A.R. 279, 292, 294, 798. Over the next few days to weeks, the pain increased and it became difficult for her to sleep or get out of her car. A.R. 294. She could not see her primary care physician, Michael Chase, at that time, but she was examined by a nurse practitioner in his office, who found nothing wrong. A.R. 279,

292.  She began taking Advil daily, which improved her symptoms temporarily.  A.R. 294.

Seh's symptoms returned around June or July 2002 and became so bad that she could barely get out of bed.  A.R. 294.  She also began experiencing muscle spasms.  A.R. 294.  In June 2002, Dr. Chase's office referred her to Heinzelman Physical Therapist in San Rafael.  A.R. 292.  She reported that the physical therapy was "not particularly helpful."  A.R. 294.

In October 2002, Seh saw Dr. Hoyman Hong, a physiatrist in San Francisco.  A.R. 292, 294.  Seh told Dr. Hong that her symptoms continued to worsen, and her back pain ranged from 4/10 to 10/10 in intensity.  A.R. 300.  Dr. Hong noted that Seh can usually sit comfortably for only 15 minutes at a time, although sometimes she is able to sit for several hours.  A.R. 300.  Seh reported she could walk without any difficulty or limitation.  A.R. 300.  She stated that she has morning stiffness in her low back.  A.R. 301.  Dr. Hong wrote that Seh was in no acute distress and was able to participate in the examination without any difficulty.  A.R. 301.  Inspection of her lumber spine showed no evidence of deformity and no lower extremity atrophy or wasting.  A.R. 301.  She had a full lumbar range of motion, full strength in her lower extremities, and her gait was normal.  A.R. 301.  Results from X-rays showed a normal alignment of the thoracic and lumbar spine, with mild degenerative changes in the facet joints.  A.R. 302.  Dr. Hong determined that there was a suggestion of a pars defect at L5.  A.R. 377.  Dr. Hong opined that Seh's symptoms were most likely associated with an injury to her disc annulus.  A.R. 302.

Dr. Hong referred Seh to a physical therapist, Margaret Andersen, whom she saw between October 2002 and April 2003.  A.R. 292-93.  Seh reported that Andersen was "extremely helpful," although she continued to experience significant morning stiffness.  A.R. 294.  In November 2002, she saw a chiropractor.  A.R. 293.  In March 2003, she began seeing Rose Crane, an acupuncturist, for her back pain and reported that it was "the only thing that seems to work."  A.R. 293, 295.

Crane referred Seh to a rheumatologist, Dr. Claire Targoff, who performed a consultation in September 2003.  A.R. 294-98.  Dr. Targoff noted that Seh was "alert and oriented," and "in no acute distress."  A.R. 296.  The musculoskeletal exam revealed mostly normal range of motion in her extremities, although Dr. Targoff wrote that Seh had tenderness in her neck and back.  A.R. 297.  Dr. Targoff assessed Seh with chronic back pain but stated that it was unlikely to be fibromyalgia.

A.R. 298.

In October 2003, Seh reported severe back pain to Dr. Targoff. A.R. 290-91. Seh reported that the pain was "so incredibly bad I couldn't move and was in tears." A.R. 291 (emphasis in original). Seh stated that this was the first time she had such symptoms. A.R. 291.

MRI results from October and November 2003 showed mild disc desiccation in Seh's thoracic spine, and possible hypertrophy of the posterior facets, but the findings were otherwise normal. A.R. 286-89.

On January 23, 2007, Seh received another MRI scan of the thoracic spine. A.R. 285. The results were "essentially normal" and unchanged from the prior study of November 2003. A.R. 285. The examiner noted slight hypertrophy of ligamentum flavum at the T9-10 level, which was also present in the 2003 MRIs and "most likely of no clinical significance." A.R. 285.

Radiology results from February 2007 indicated a pars defect. A.R. 330. MRI results from June 2007 indicated mild foraminal narrowing due to uncinate spurring, but no evidence of focal disc protrusion or spinal stenosis. A.R. 332. Another MRI of Seh's thoracic spine in July 2007 once again showed ligamentum flavum and facet hypertrophy at the T9-10 level. A.R. 535.

An MRI of Seh's lumbar spine in September 2007 showed mild stress-related edema as well as bilateral facet joint arthrosis. A.R. 430. A single-photon emission computerized tomography (SPECT) scan indicated possible early osteoarthritis in Seh's hip and knee joints, and again noted a focal abnormality at the right facet joint region of L5. A.R. 478. Another MRI of Seh's lumber spine in February 2008 confirmed mild bilateral facet joint arthrosis. A.R. 569. An MRI of her cervical spine showed minimal disc bulge at the C5-6 level but was otherwise unremarkable. A.R. 570. Another MRI in September 2008 found mild disc desiccation at the C5-6 level. A.R. 621.

In June 2007, Seh was seen by Marilyn Robertson, M.D., a neurologist. A.R. 352. She reported that she had been experiencing tingling on the right side of her body. A.R. 352. Dr. Robertson noted that Seh had a past history for back pain and a pars defect. A.R. 352. The neurological evaluation revealed some weakness in Seh's right extremities, as well as "subtle but present neurological deficits." A.R. 353.

Around April 2007, Seh started seeing Rosel Mulkey, who is an acupuncturist and has a

Ph.D. in physiology. A.R. 659, 1056. Seh told Dr. Mulkey that her symptoms had been getting worse over 5 years. A.R. 665. Seh also indicated that sitting makes her condition worse. A.R. 6654. She wrote that the pain was constant, and between moderate and severe. A.R. 665. Seh saw Dr. Mulkey from April 2007 through September 2007, between January 2008 and October 2010, and from November 2011 through June 2012. A.R. 1056. During this time, Seh continued to report severe pain. A.R. 703, 708, 710, 713, 716, 720, 723-24, 743.

Physical therapy notes from October 2008 through January 2009 indicated that Seh's symptoms continued to intensify. A.R. 627-54. She reported that she could not do dishes for longer than 5-10 minutes at a time. A.R. 631. Sometimes she could not pick up a pot and her husband did most of the household chores. A.R. 633. She reported having difficulty standing more than 5 minutes at a time. A.R. 637. Typing made her hands and forearms very sore. A.R. 645. In December 2008, Seh's physical therapist reported that her progress had been "minimal" and stated that "[s]he needs to stop working to make some progress." A.R. 640. A progress report from February 2009 indicated that Seh cannot use her arms for longer than 5-10 minutes and was not able to stand longer than one to two hours. A.R. 651.

Dr. Mulkey referred Seh to Barbara "Grace" Pike-Armbrust, D.C., whom Seh saw between March 2009 and July 2010 and again in December 2011. A.R. 753, 1024. Dr. Pike-Armbrust assessed spinopelvic dyskinesia. A.R. 771. She wrote that Seh experienced some relief from her various treatments but that her progress was possibly set back by her performing light work and "pushing through fatigue and pain to 'just do it.'" A.R. 772. Dr. Pike-Armbrust opined that Seh has significant chronic disability that resisted multiple sources of traditional chronic pain management. A.R. 772. She also wrote that "[t]his situation occurs, without clear objective explanation in some people." A.R. 772. Dr. Pike-Armbrust stated that she did not expect Seh to return to her previous professional activity (law and real estate) and that Seh may need job retraining. A.R. 772.

In July 2010, Seh began seeing Stephen Nimelstein, M.D., at the Thoracic Outlet Syndrome Clinic at UCSF. A.R. 798. Dr. Nimelstein wrote a comprehensive review of Seh's medical history and symptoms. A.R. 798-800. He reviewed the MRI results obtained in 2007 and 2008 and wrote

that the findings predispose Seh to neurogenic thoracic outlet syndrome. A.R. 799. He noted that Seh's symptoms included pain in her neck, back, upper right extremity, and lower right extremity, with lesser pain in her upper left extremity and both axillae. A.R. 799. Seh also developed episodic chest pain associated with the other symptoms but had a negative cardiac evaluation. A.R. 799. She reported numbness and tingling in her lower right extremity as well as tingling in both hands. A.R. 799. Dr. Nimelstein wrote that Seh was still working but cut down her work time to 12 to 15 hours per week. A.R. 799. He determined that activities that aggravated her symptoms included driving, housework, cooking, and reaching upward. A.R. 799.

Dr. Nimelstein wrote that, on examination, Seh was not in acute distress. A.R. 800. Strength was normal throughout her upper extremities and her shoulders had full painless range of motion. A.R. 800. He found that Seh's neck had a mild decrease in range of motion in all directions. A.R. 800. His impression was that Seh had symptoms consistent with neurogenic thoracic outlet syndrome. A.R. 800. Dr. Nimelstein wrote that Seh could do some work but "pays a price of worse symptoms." A.R. 800. He opined that "the long term result of this pattern is a potential chronic worsening of symptoms and disability," and that "even the current low level of work is making her worse." A.R. 800-01. Dr. Nimelstein concluded that Seh is completely rather than partially disabled and that he would "like to see her completely off work for now." A.R. 300-01.

In October 2010, Seh started seeing Peter Edgelow, a physical therapist. A.R. 779-80. By October 2010, Seh was working part-time at home, around 10-15 hours per week. A.R. 779. She did about 1-2 hours of computer work per day but said her symptoms would flare within 15 minutes. A.R. 779. In January 2011, Edgelow wrote that "[t]here has been no significant sustained decrease in pain associated with the [physical therapy] exercises." A.R. 795. He stated that Seh could walk for 20 minutes 2-3 times per day, sit for 7 hours, drive 40 minutes twice per day, read 15 minutes with a stand, and at best could do 1-2 hours of data entry (0 on a "flared" day). A.R. 795. He wrote that she could write 2 sentences and could lift and carry a fanny pack. A.R. 795.

Dr. Nimelstein saw Seh again in November 2010. A.R. 806-07. He wrote that there had been no major change in her symptoms. A.R. 806. Regarding Seh's physical therapy sessions with Edgelow, Dr. Nimelstein stated it "has been a challenge in trying to find the right amount of effort

that does not increase symptoms." A.R. 806. Even breathing exercises risked flaring Seh's back pain, possibly related to the pars defect found in earlier examinations. A.R. 806. Dr. Nimelstein wrote that Seh's part-time work often increases her symptoms. A.R. 806. He stated that Seh's symptoms are "far out of proportion to whatever findings there have been on imaging," and that she likely had neurogenic thoracic outlet syndrome as part of widespread peripheral and central nervous system sensitization. A.R. 807.

In March 2011, Dr. Nimelstein wrote that there had still been no major change. A.R. 808. He stated that Seh's symptoms are made worse by any use of her upper extremities, which can sometimes be temporarily relieved through walking. A.R. 808. Dr. Nimelstein wrote that "the stress of work, both physical and psychological, worsens symptoms" but Seh felt "forced" to work at least part time because of her disability policy. A.R. 808. A limited examination revealed normal strength and tone in all four extremities, although Seh reported pain and tingling during various physical tests, even just breathing exercises. A.R. 809. Dr. Nimelstein noted that Seh's symptoms appear to be those of widespread nervous sensitization with widespread pain and that the problem was much more widespread than typical for neurogenic thoracic outlet syndrome. A.R. 809. He said it was unclear what treatment was available, as surgery could make her worse and she had not responded well to various medications. A.R. 809. Dr. Nimelstein concluded that Seh would ideally stop working so they could work on decreasing her daily activities to a level that does not increase symptoms. A.R. 809.

The record contains treatment notes from Ilkcan Cokgor, M.D., from approximately November 2007 through December 2015. A.R. 915-36, 1067-74, 1077-79, 1097-1100. During an initial consultation in November 2007, Seh presented with complaints of fatigue, pain, weakness in her legs, trouble walking, numbness in her legs, and respiratory problems. A.R. 934. Dr. Cokgor wrote that Seh's previous MRIs were negative for multiple sclerosis or myelitis. A.R. 934. He noted that her gait was wide and she cannot walk tandem. A.R. 935. He opined that she may have suffered from transverse myelitis and it was "very evident that she has some central nervous system findings." A.R. 935. A subsequent exam in December 2007 showed full strength in all of Seh's extremities, although Seh reported that she still had pain in her neck and back and severe spasms in

her back. A.R. 933. In January 2008, Seh again reported intense pain to Dr. Cokgor. A.R. 931. An examination revealed full muscle strength in all extremities, except for 4/5 strength in her right foot. A.R. 931. Dr. Cokgor also noted that Seh had a spastic gait. A.R. 931. Another examination in February 2008 showed full strength in all extremities and no ataxia in Seh's gait. A.R. 930. Seh also reported to Dr. Cokgor that her pain was not as intense as it had been before. A.R. 930. In August 2008, Dr. Cokgor assessed 4/5 strength in all Seh's extremities. A.R. 929. Seh reported that some days were worse than others and overall had the same amount of pain in her neck and full back. A.R. 929. In November 2008, Dr. Cokgor noted possible thoracic outlet syndrome and fibromyalgia in addition to transverse myletis. A.R. 928. He recommended physical therapy as well as an MRI to rule out thoracic outlet syndrome. A.R. 928. The MRI results confirmed thoracic outlet syndrome. A.R. 927. For the remaining period of treatment through 2015, Seh continued to report severe and constant pain although her muscle strength was usually assessed at 4/5 or 5/5 in all extremities. A.R. 915, 917, 918, 919, 920, 921, 922,923, 924, 925, 927, 1097, 1099.

### 2. Harry Friedman, D.O.

On April 25, 2007, Dr. Friedman completed an attending physician's statement. A.R. 342-43. He wrote that he had been treating Seh for approximately eight months. A.R. 342. Dr. Friedman assessed diagnoses of musculoligamentous injury and facet disease of the lumbar and thoracic spine, ribs, neck, low back, and sacro-pelvic region, as well as a diagnosis of chronic fatigue. A.R. 342. He noted that Seh's symptoms included constant pain and muscles spasms in the mid to upper back, neck, and shoulders, which is exacerbated to severe levels by sitting for 15 minutes, bending her head, stooping, or lifting. A.R. 342. Dr. Friedman wrote that Seh experiences pain when she turns her head or stands more than 30 minutes, and that sometimes she seizes and cannot move her back and neck at all. A.R. 342. He assessed limitations requiring Seh to sit or drive for no more than 15 minutes, stand for more than one hour, and lift no more than 20 pounds or 10 pounds repetitively. A.R. 343. He wrote that he anticipated these restrictions to be medically necessary for approximately one year or possibly indefinitely. A.R. 343.

//

//

### 3. Marilyn Robertson, M.D.

There are several medical source statements written by Dr. Robertson, dated between December 24, 2007 and July 31, 2008. A.R. 582-84, 585-87, 601-03, 612-616. Each is essentially identical and report that Seh is not able to sit for prolonged periods and that standing causes discomfort. A.R. 583, 586, 603, 613, 616. They also note that Seh was at that time working at reduced capacity and that Dr. Robertson expected the listed restrictions to persist indefinitely. A.R. 583, 586, 603, 613, 616. Portions of the evaluations are blank, such as the section asking the evaluator to explain the medical basis for her recommendations and the onset date of the limitations. A.R. 583, 586, 603, 613, 616.

### 4. Barbara Pike-Armbrust, D.C.

On May 22, 2012, Dr. Pike-Armbrust wrote a letter to the Department of Social Services in support of Seh's disability claim. A.R. 1024-25. She stated that during the two years that Seh recurrently attended care in her clinic, she did not feel that any lasting progress was made and any positive responses to treatment were temporary and not cumulative. A.R. 1024-25. Dr. Pike-Armbrust wrote that Seh arrived in her clinic with extensive, chronic neurovascular compression signs and symptoms, and that the symptoms were of a physical and metabolic inflammatory nature. A.R. 1025. She stated that Seh "tried desperately to continue her work as a realtor, attorney, mother and daughter, even after several health care providers (myself include) had recommended that she take time off/slow down." A.R. 1025. Dr. Pike-Armbrust opined that Seh could likely not return productively to the workplace, and that most weight-bearing physical posturing and activity stimulate pain, exhaustion, and weakness. A.R. 1025. She wrote that any increase of responsibility contributes to various symptoms, fatigue, and weakness, and that her physical symptoms undermine her memory, sustained concentration, and adaptability. A.R. 1025. Dr. Pike-Armbrust concluded that Seh's prognosis was very poor and that she strongly recommended awarding Seh full disability payments. A.R. 1025.

### 5. Rosel Mulkey, Ph.D.

On June 14, 2012, Dr. Mulkey wrote a letter to the Department of Social Services in support of Seh's disability application. A.R. 1056-59. Dr. Mulkey is a licensed acupuncturist and Chinese

herbalist, and has a Ph.D in physiology with a specialty in neurobiology. A.R. 1056.

Dr. Mulkey wrote that Seh's initial complaint in 2007 was of neck and back pain, which Seh reported had been getting worse since 2002. A.R. 1056. Seh further reported that the pain was constant and would get worse with driving, sitting, carrying objects, opening jars, rubbing her hands together, wearing heels, sleeping, cooking, washing dishes, or doing any other housework. A.R. 1056. Seh told Dr. Mulkey that her chiropractic treatments with Dr. Friedman offered some relief. A.R. 1056.

Physical examination of Seh's neck revealed a very limited range of motion and Seh reported that all movements of her neck were painful. A.R. 1057. Dr. Mulkey had diagnosed Seh with thoracic outlet syndrome and recommended she get an MRI to confirm the diagnosis. A.R. 1057. In May 2007, Seh began complaining of tingling and pain in her right arm and leg, with severe heaviness of her right leg. A.R. 1057. Dr. Mulkey reported that MRI results were negative for multiple sclerosis or stroke, but revealed a pars defect. A.R. 1057. Dr. Cokgor later diagnosed Seh with neurogenic thoracic outlet syndrome. A.R. 1057.

Dr. Mulkey wrote that Seh continued to work as a realtor and an attorney as well as a parent, and her symptoms progressively got worse. A.R. 1058. Dr. Mulkey reviewed the multiple treatments that Seh had sought over the years, including acupuncture, physical therapy, and chiropractic care, and that she had not received any permanent relief from any treatment. A.R. 1058. Dr. Mulkey stated that she had not observed any lasting progress in the five years she has treated Seh. A.R. 1058. She wrote that the physical and mental stress of Seh's work "definitely contributed to the increase in symptoms" and any physical activities stimulate her pain and increase inflammation. A.R. 1058. "Something as benign as writing a check or picking up a coffee cup can start an entire cascade of pain symptoms that eventually will include the entire body," she wrote. A.R. 1058-59. Dr. Mulkey also stated that it may take weeks to recover from an event that sets off the pain cycle. A.R. 1059.

Dr. Mulkey concluded that the medical prognosis for Seh is poor and the chances that she would improve enough to be able to perform work-related physical or mental activities were minimal. A.R. 1058.

### 6.     Ilkan Cokgor, M.D.

On August 6, 2014, Ilkan Cokgor, M.D., completed a medical source statement. A.R. 1080-83. He diagnosed Seh with fibromyalgia, thoracic outlet syndrome, and transverse myelitis. A.R. 1080. He wrote that her symptoms included pain in her arms, legs, back, and lower extremities, as well as stiffness, numbness, and jaw clenching. A.R. 1080. He opined that Seh could sit and stand for 15 minutes at a time, and could sit, stand, or walk less than an hour each total in an 8-hour workday. A.R. 1081. Dr. Cokgor wrote that Seh cannot lift or carry any weight at all, look down, turn her head right or left, look up, or hold her head in a static position. A.R. 1082. He opined that she can never twist, stoop or bend, crouch or squat, climb ladders, or climb stairs. A.R. 1083. Dr. Cokgor also wrote that Seh could not use her hands, fingers, or arms for twisting, manipulation, or reaching. A.R. 1083. He concluded that Seh's impairments were expected to last at least twelve months. A.R. 1080.

### 7.     State Agency Medical Consultants

H. Pham, M.D., reviewed Seh's records and assessed her physical RFC on July 12, 2012. A.R. 70-82. Dr. Pham opined that Seh can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, walk, and sit for 6 hours in an 8-hour work day; occasionally climb ramps or stairs; never climb ladders; frequently stoop and crouch; occasionally crawl; never reach above her shoulders on either side; and frequently reach otherwise. A.R. 78-80. Dr. Pham stated that Seh is not limited in pushing or pulling (other than the weight restrictions noted above), balancing, kneeling, handling, fingering, or feeling. A.R. 79-80. Dr. Pham concluded that Seh is limited to light work. A.R. 81.

Bill F. Payne, M.D., reviewed Seh's records on April 5, 2014. A.R. 84-88. Dr. Payne did not complete an RFC assessment or review Seh's symptoms and credibility. A.R. 87-88. Dr. Payne wrote that there was insufficient evidence to rate Seh's physical impairments as of her last date insured, which was December 31, 2011. A.R. 87.

On September 18, 2014, G. Williams, M.D., reviewed the records at the reconsideration level. A.R. 93-98. Dr. Williams assessed Seh's RFC, finding that she can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, walk, and sit for 6 hours in an 8-hour work day;

frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders. A.R. 103-04. Dr. Williams that Seh was limited in her right upper extremity but could frequently push or pull. A.R. 103. Dr. Williams concluded that Seh is not disabled but is limited to light work. A.R. 105.

## IV.  STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.  ISSUES PRESENTED

Seh argues that the ALJ erred in weighing the medical opinions and in assessing Seh's credibility. She argues that as a result of these errors, the ALJ erred in assessing Seh's RFC. The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A.    Weighing of the Medical Opinions

The ALJ discussed the medical evidence and gave great weight to the opinions of Drs. Pham and Williams, two of the state agency medical physicians.  She gave partial weight to the opinion of Dr. Payne, who is the remaining state agency medical physician, and partial weight to the opinions of Drs. Friedman, Robertson, and Cokgor.  She assigned little weight to the opinions of Drs. Nimelstein, Mulkey, and Pike-Armbrust.

Seh argues that the ALJ erred by assigning too little weight to the opinions of Drs. Friedman, Robertson, Cokgor, Nimelstein, Mulkey, and Pike-Armbrust.

### 1.    Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient.  Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians").  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion.  *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities.  *Reddick*, 157 F.3d at 722.  A treating physician's opinion, while entitled to more weight, is not necessarily conclusive.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996).  If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion.  *Lester*, 81 F.3d at 830.  The

ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Nimelstein Opinions

Between July 2010 and March 2011, Dr. Nimelstein wrote three summaries of Seh's symptoms and treatment. A.R. 798-800, 806-07. In July 2010, Dr. Nimelstein wrote a comprehensive review of Seh's medical history and symptoms. A.R. 798-800. At that time, Seh was working 12-15 hours per week. A.R. 799. He reviewed the MRI results obtained in 2007 and 2008 and wrote that the findings predispose Seh to neurogenic thoracic outlet syndrome. Dr. Nimelstein wrote that Seh could do some work but "pays a price of worse symptoms." A.R. 800. He opined that "the long term result of this pattern is a potential chronic worsening of symptoms and disability," and that "even the current low level of work is making her worse." A.R. 800-01. Dr. Nimelstein concluded that Seh is completely rather than partially disabled and that he would "like to see her completely off work for now." A.R. 300-01.

In November 2010, Dr. Nimelstein wrote that there had been no major change in Seh's symptoms. A.R. 806. Regarding Seh's physical therapy sessions with Edgelow, Dr. Nimelstein stated it "has been a challenge in trying to find the right amount of effort that does not increase symptoms." A.R. 806. Even breathing exercises risked flaring Seh's back pain, possibly related to the pars defect found in earlier examinations. A.R. 806. Dr. Nimelstein wrote that Seh's part-time work often increases her symptoms. A.R. 806. He stated that Seh's symptoms are "far out of proportion to whatever findings there have been on imaging," and that she likely had neurogenic thoracic outlet syndrome as part of widespread peripheral and central nervous system sensitization. A.R. 807.

In March 2011, Dr. Nimelstein wrote that there had still been no major change. A.R. 808. He stated that Seh's symptoms are made worse by any use of her upper extremities, which can sometimes be temporarily relieved through walking. A.R. 808. Dr. Nimelstein wrote that "the stress of work, both physical and psychological, worsens symptoms." A.R. 808. A limited examination revealed normal strength and tone in all four extremities, although Seh reported pain and tingling during various physical tests, even just breathing exercises. A.R. 809. Dr. Nimelstein noted that Seh's symptoms appear to be those of widespread nervous sensitization with widespread pain and that the problem was much more widespread than typical for neurogenic thoracic outlet syndrome. A.R. 809. He said it was unclear what treatment was available, as surgery could make her worse and she had not responded well to various medications. A.R. 809. Dr. Nimelstein concluded that Seh would ideally stop working so they could work on decreasing her daily activities to a level that does not increase symptoms. A.R. 809.

The ALJ gave three reasons for assigning little weight to Dr. Nimelstein's opinions. First, she stated that Dr. Nimelstein's opinion that Seh should stop working is a determination reserved to the Commissioner. A.R. 37. Opinions on some issues, such as opinions that an applicant for disability benefits is disabled "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). To the extent that Dr. Nimelstein's opinions address the ultimate determination of disability, the ALJ did

not err in disregarding those opinions.

Second, the ALJ discredited Dr. Nimelstein's opinions on the basis that Seh "was in fact working at least part-time during this period, which is inconsistent with such an opinion." A.R. 37. To the contrary, Dr. Nimelstein specifically recognized that Seh had the physical ability to complete some work (at that time, Seh was working about 12-15 hours per week). A.R. 799-800. However, Dr. Nimelstein stated repeatedly that Seh's part-time work and even physical therapy exercises resulted in further worsening of her symptoms. A.R. 800-01, 806. He wrote that she "pays a price of worse symptoms" when she works. A.R. 800. He opined that "the long term result of this pattern is a potential chronic worsening of symptoms and disability," and that "even the current low level of work is making her worse." A.R. 800-01. These observations are consistent with Seh's treatment records from the period that Seh was working part time. Physical therapy notes from October 2008 through January 2009 indicated that Seh's symptoms continued to intensify. A.R. 627-54. She reported that she could not do dishes for longer than 5-10 minutes at a time, and had difficulty standing more than 5 minutes at a time. A.R. 631, 637. Typing made her hands and forearms very sore. A.R. 645. In December 2008, Seh's physical therapist reported that her progress had been "minimal" and stated that "[s]he needs to stop working to make some progress." A.R. 640. Notes from October 2010 indicate that Seh did about 1-2 hours of computer work per day but her symptoms would flare within 15 minutes. A.R. 779. In January 2011, her physical therapist wrote that "[t]here has been no significant sustained decrease in pain associated with the [physical therapy] exercises." A.R. 795. He stated that she could at best do 1-2 hours of data entry a day (0 on a "flared") day. A.R. 795.

Dr. Nimelstein's observations that Seh's physical activities, including work, exacerbated her symptoms is not inconsistent with his opinions as to the nature and severity of her symptoms. The ALJ mischaracterized Dr. Nimelstein's opinions as a bare statement that Seh could not work and failed to address Dr. Nimelstein's in-depth analysis of her symptoms and aggravating factors. Accordingly, Seh's part-time work during the time she was treated by Dr. Nimelstein is not a specific and legitimate reason supported by substantial evidence to discount Dr. Nimelstein's opinions as to the nature and severity of her symptoms.

Third, the ALJ wrote that the objective findings "document [Seh's] fairly intact physical functioning, which is not suggestive on an individual who is unable to work," citing to Seh's various strength tests and MRI results. A.R. 37. In July 2010, Dr. Nimelstein reviewed the medical evidence at length, including the MRI tests. A.R. 798-800. He explained how the irregularities found in the MRIs and his own examinations result in the symptoms Seh described:

> The nervous system as a physical structure is continuous. [Seh] has an anatomy that results in pressure and tension involving neural structures in the upper part of her body and this tension can potentially be transmitted physically through the nervous system to lower neural structures. This might make these neural structures more susceptible to tension or compression than they might otherwise be.

A.R. 800. In November 2010, Dr. Nimelstein observed that Seh wiggling her right index finger can cause pain shooting down her right leg to her big toe and wrote, "This is an illustration of how sensitive her nervous system is, and also about the connectivity between one part of the nervous system and another." A.R. 806. He also noted that Seh's breathing exercises might flare her back pain in part because of the pars defect found on the imaging tests. A.R. 806. He wrote that Seh's symptoms "are far out of proportion to whatever findings there have been on imaging" and that Seh has neurogenic thoracic outlet syndrome "as part of a widespread peripheral and central nervous system sensitization." A.R. 807. In March 2011, Dr. Nimelstein performed an examination and observed how Seh's symptoms increased with any movement of her extremities and even breathing exercises. A.R. 962. He stated that her symptoms were typical of neurogenic thoracic outlet syndrome, but "obviously, the problem is much more widespread." A.R. 962. Dr. Nimelstein also opined that Seh's treatment options were limited because she had not tolerated medication well and it was "not at all clear that surgery would help her with these widespread symptoms, and there is always the distinct possibility that surgery could make her worse." A.R. 962.

Dr. Nimelstein's opinions detail the objective medical evidence at length and explain both how Seh's symptoms are consistent with the evidence and why objective testing is of limited value as to her condition. Dr. Nimelstein is a physician at the Thoracic Outlet Syndrome Clinic at UCSF, and as a medical practitioner employed in the area of Seh's specific disability, he qualifies as a specialist in thoracic outlet syndrome. The medical opinion of a specialist about medical issues

related to his or her area of specialty is generally afforded more weight. 20 C.F.R. § 404.1527(c)(5). The ALJ does not discuss or even mention Dr. Nimelstein's review of Seh's MRI results and the explanations Dr. Nimelstein, as a medical specialist, provides as to the limitations of those tests.

Further, although much of the briefing and the record focuses on the thoracic outlet syndrome diagnosis, Seh was also diagnosed with fibromyalgia, which the ALJ determined is a severe impairment. A.R. 29. Fibromyalgia is a "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). It is characterized by "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." *Id.* at 590. "What is unusual about the disease is that those suffering from it have 'muscle strength, sensory functions, and reflexes [that] are normal.'" *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) (quoting *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting)) (further quotations omitted). Fibromyalgia's "cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Rollins*, 261 F.3d at 855 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). In citing to Seh's strength tests as objective medical evidence that undermines Dr. Nimelstein's opinion, the ALJ did not discuss or consider that some conditions, including at least one of Seh's conditions, escape traditional laboratory analysis. Accordingly, the ALJ's own evaluation of the MRI results and Seh's strength tests is not a specific and legitimate reason supported by substantial evidence to discount Dr. Nimelstein's opinion.

The court concludes that the ALJ erred in evaluating Dr. Nimelstein's opinions.

### b. Friedman Opinion

On April 25, 2007, Dr. Friedman completed an attending physician's statement. A.R. 342-43. Dr. Friedman assessed diagnoses of musculoligamentous injury and facet disease of the lumbar and thoracic spine, ribs, neck, low back, and sacro-pelvic region, as well as a diagnosis of chronic fatigue. A.R. 342. He opined that Seh was limited to sitting or driving for 15 minutes, standing for 1 hour, and lifting no more than 20 pounds in a single lift or 10 pounds repetitively. A.R. 343.

The ALJ gave three reasons for assigning only partial weight to Dr. Friedman's opinion. First, Dr. Friedman's statement is dated prior to the alleged onset date of disability, which is September 25, 2008. A.R. 36. Dr. Friedman also stated that he anticipated the work restrictions he assessed would be medically necessary for one year or "maybe indefinitely." A.R. 343. The ALJ wrote that Dr. Friedman's statement "would suggest that the doctor's opinion is not pertinent to the period in question or that the claimant was expected to improve." A.R. 36. The date of Dr. Friedman's opinion is not a specific and legitimate reason supported by substantial evidence to discount it. "In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record." 42 U.S.C. § 423(d)(5)(B). Although the ALJ stated that Dr. Friedman "expected" Seh to improve, she did not identify any evidence in the record showing improvement of Seh's symptoms. To the contrary, Seh's treatment records consistently indicate worsening of symptoms over time. A.R. 631, 637, 640, 779, 795, 800-01, 806. Moreover, the ALJ did not address or even mention that Dr. Friedman further stated that the symptoms may last "indefinitely," an opinion which undercuts the ALJ's inference that Dr. Friedman expected to see improvement in Seh's condition.

Second, the ALJ discounted Dr. Friedman's opinion on the basis that "such extreme sitting and standing limitations are not consistent with the record as a whole." A.R. 36. As examples, she pointed to portions of the record where Seh was assessed to have a normal gait with full strength in both upper and lower extremities, and she also stated that there is no indication of any lasting balance or coordination issues. A.R. 36. As detailed above in the discussion of Dr. Nimelstein's opinion, the ALJ's evaluation of Seh's MRI results and strength tests does not discount the opinions of Seh's treating providers as to her symptoms and physical limitations, given the nature of the severe impairments recognized by the ALJ.

Finally, the ALJ discounted Dr. Friedman's opinion on the basis that it was "not supported with any sort of explanation." A.R. 36. To the contrary, Dr. Friedman diagnosed Seh with multiple conditions, described her symptoms, detailed clinical findings supporting facet hypertrophy and severe muscle spasms diagnosed using palpatory testing procedures, and stated that the medical

22

basis for his recommendations was based on "clear musculoligamentous injury to neck, back, ribs and pelvis, probable spine disc and joint damage and ongoing inflammation." A.R. 342-43. The ALJ did not mention these findings or explain why they were insufficient to support Dr. Friedman's assessment of Seh's limitations.

Accordingly, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount Dr. Friedman's opinion.

### c.     Robertson Opinion

There are several medical source statements written by Dr. Robertson, dated between December 24, 2007 and July 31, 2008. A.R. 582-84, 585-87, 601-03, 612-616. Each is essentially identical and report that Seh is not able to sit for prolonged periods and that standing causes discomfort. A.R. 583, 586, 603, 613, 616. They also note that Seh was at that time working at reduced capacity and that Dr. Robertson expected the listed restrictions to persist indefinitely. A.R. 583, 586, 603, 613, 616.

The ALJ gave two reasons for assigning only partial weight to Dr. Robertson's opinions. First, she stated that the sitting and standing limitations are not supported by the record, "which shows generally normal lower extremity functioning." A.R. 36. She cited the same portions of the record used to discount Dr. Friedman's opinion, which show that Seh occasionally tested at full strength in her upper and lower extremities. She also stated that the MRIs of Seh's lumbar spine "showed no more than mild to moderate findings, which is not suggestive of an individual who would have serious problems sitting." A.R. 36. For the reasons detailed above, the ALJ's citations to Seh's strength tests and MRI results are not a specific and legitimate reason supported by substantial evidence to discount Dr. Robertson's opinions.

Second, the ALJ wrote that Dr. Robertson's opinions were not supported with an explanation as to why the claimant is limited in such as fashion." A.R. 36. The various statements provided by Dr. Robertson are perfunctory and vague. For example, under the section that asks for specific restrictions, Dr. Robertson merely wrote, "She is working now but at reduced capacity." A.R. 583, 586, 603, 613, 616. Portions of the evaluations are entirely blank, such as the section asking the evaluator to explain the medical basis for her recommendations and the onset date of the limitations.

A.R. 583, 586, 603, 613, 616. The lack of supporting explanation or detail as to Seh's limitations is a specific and legitimate reason to discount Dr. Robertson's opinion.

Accordingly, the court concludes that the ALJ did not err in assigning partial weight to Dr. Robertson's opinion.

### d. Pike-Armbrust Opinion

On May 22, 2012, Dr. Pike-Armbrust wrote a letter to the Department of Social Services in support of Seh's disability claim. A.R. 1024-25. She stated that during the two years that Seh recurrently attended care in her clinic, she did not feel that any lasting progress was made and any positive responses to treatment were temporary and not cumulative. A.R. 1024-25. Dr. Pike-Armbrust opined that Seh could likely not return productively to the workplace, and that most weight-bearing physical posturing and activity stimulate pain, exhaustion, and weakness. A.R. 1025. She wrote that any increase of responsibility contributes to various symptoms, fatigue, and weakness, and that her physical symptoms undermine her memory, sustained concentration, and adaptability. A.R. 1025. Dr. Pike-Armbrust concluded that Seh's prognosis was very poor and that she strongly recommeneded awarding Seh full disability payments. A.R. 1025.

The ALJ gave three reasons for assigning little weight to Dr. Pike-Armbrust's opinion. First, Dr. Pike-Armbrust recommended that Seh be awarded disability payments, which is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d). The ALJ did not err in disregarding Dr. Pike-Armbrust's opinion as to the ultimate determination of disability.

Second, the ALJ again pointed to the objective findings in the record, such as MRI results and strength tests. For the reasons detailed above, these test results are not specific and legitimate reasons supported by substantial evidence to discount a physician's opinion as to the nature and severity of Seh's symptoms in the context of the specific severe impairments at issue in this case.

Third, the ALJ noted that Dr. Pike-Armbrust did not provide "any indication as to the extent that the claimant's abilities to function in the work place were limited." A.R. 37. Dr. Pike-Armbrust's opinions as to Seh's limitations are vague and perfunctory. Although she wrote that "most weight-bearing physical posturing and activity stimulate pain, exhaustion, and weakness," she did not assess any specific limitations or explain how Seh's symptoms would impact her ability

24

to perform in the workplace.  A.R. 1025.  The lack of supporting explanation or detail as to Seh's limitations is a specific and legitimate reason to discount Dr. Pike-Armbrust's opinion.

Accordingly, the ALJ did not err in assigning little weight to Dr. Pike-Armbrust's opinion.

### e.    Mulkey Opinion

On June 14, 2012, Dr. Mulkey wrote a letter to the Department of Social Services in support of Seh's disability application.  A.R. 1056-59.  Physical examination of Seh's neck revealed a very limited range of motion and Seh reported that all movements of her neck were painful.  A.R. 1057. Dr. Mulkey reviewed the multiple treatments that Seh had sought over the years, including acupuncture, physical therapy, and chiropractic care, and noted that she had not received any permanent relief from any treatment.  A.R. 1058.  Dr. Mulkey stated that she had not observed any lasting progress in the five years she had treated Seh.  A.R. 1058.  She wrote that the physical and mental stress of Seh's work "definitely contributed to the increase in symptoms" and any physical activities stimulate her pain and increase inflammation.  A.R. 1058.  "Something as benign as writing a check or picking up a coffee cup can start an entire cascade of pain symptoms that eventually will include the entire body," she wrote.  A.R. 1058-59.  Dr. Mulkey also stated that it may take weeks to recover from an event that sets off the pain cycle.  A.R. 1059.  Dr. Mulkey concluded that the medical prognosis for Seh is poor and the chances that she would improve enough to be able to perform work-related physical or mental activities were minimal.  A.R. 1058.  She recommended awarding full disability payments.  A.R. 1059.

The ALJ provided three reasons why she assigned little weight to Dr. Mulkey's opinion. First, the ALJ correctly disregarded Dr. Mulkey's opinion that Seh should be awarded disability payments, as that is a matter reserved to the Commissioner.  A.R. 37, 20 C.F.R. § 404.1527(d).

Second, the ALJ noted that Dr. Mulkey opined as to the mental stress Seh experiences because of her symptoms, and stated that Seh's mental status examinations are not suggestive of any stress-related limitations.  A.R. 37.  Dr. Mulkey opined that "the constant, chronic pain, definitely affects Ms. Seh's memory and ability to concentrate," but did not assess specific limitations on Seh's mental functioning.  Seh does not point to other evidence in the record regarding her limitations in memory and concentration.  Seh's mental status is rarely mentioned at all in the

25

1    record, and assessments generally note that she was alert, awake, and oriented.  A.R. 915-36, 1077-

2    79.  Based on the evidence presented in the record, the ALJ did not err in disregarding Dr. Mulkey's

3    conclusory statements as to Seh's mental limitations.

4        Third, the ALJ stated that Dr. Mulkey did not opine as to the exact functional limitations

5    that Seh's symptoms produced.  A.R. 37.  Dr. Mulkey opined that "[a]ny physical activities, which

6    include use of her arms, hands, lifting, carrying objects, handling objects, weight bearing, and sitting

7    for long periods of time, stimulate the pain and increase the inflammation in this patient."  A.R.

8    1058.  She described how even minor activities such as writing a check or picking up a coffee cup

9    can start a "cascade of pain symptoms" and it may take "weeks to recover from an event that set[s]

10   off this pain cycle."  A.R. 1058-59.  However, Dr. Mulkey does not state the extent to which these

11   symptoms limit Seh's ability to work.  The ALJ's reason for discounting Dr. Mulkey's opinion on

12   this basis is specific and legitimate.

13       Accordingly, the court concludes that the ALJ did not err in assigning little weight to the

14   opinion of Dr. Mulkey.

15                              **f.      Cokgor Opinion**

16       On August 6, 2014, Ilkan Cokgor, M.D., completed a medical source statement.  A.R. 1080-

17   83.  He diagnosed Seh with fibromyalgia, thoracic outlet syndrome, and transverse myelitis.  A.R.

18   1080.  He wrote that her symptoms included pain in her arms, legs, back, and lower extremities, as

19   well as stiffness, numbness, and jaw clenching.  A.R. 1080.  He opined that Seh could sit and stand

20   for 15 minutes at a time, and could sit, stand, or walk less than an hour each total in an 8-hour

21   workday.  A.R. 1081.  Dr. Cokgor wrote that Seh cannot lift or carry any weight at all, look down,

22   turn head right or left, look up, or hold her head in a static position.  A.R. 1082.  He opined that she

23   can never twist, stoop or bend, crouch or squat, climb ladders, or climb stairs.  A.R. 1083.  Dr.

24   Cokgor also wrote that Seh could not use her hands, fingers, or arms for twisting, manipulation, or

25   reaching.  A.R. 1083.  He concluded that Seh's impairments were expected to last at least twelve

26   months.  A.R. 1080.

27       The ALJ assigned Dr. Cokgor's opinion partial weight on the basis that Cokgor's "overly

28   restrictive limitations would essentially preclude the claimant from all day-to-day activities and self-

26

care." A.R. 1083. For example, Cokgor opined that Seh could "never" look in any direction or even hold her head in a static position. A.R. 1082. He also stated that she could "never" lift and carry less than 10 pounds. A.R. 1082. The ALJ correctly notes that such limitations would prohibit Seh from any daily activities, which contradicts the medical evidence of record and Seh's own testimony that she drives her children to school, puts their food in lunch boxes, and does some limited chores around the house. A.R. 57-59. Dr. Cokgor's opinion also contradicts his own treatment notes in that his opinion states that Seh's impairments are not likely to produce "good days" and "bad days," while his treatment notes record Seh's report that "some days are worse then [*sic*] others." A.R. 929, 1083; *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) ("A physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes.").

Given the contradictions between Dr. Cokgor's opinion and the medical evidence, the ALJ provided specific and legitimate reasons supported by substantial evidence to discount the opinion. Accordingly, the court concludes that the ALJ did not err in assigning partial weight to Dr. Cokgor's opinion.

### B. Seh's Remaining Arguments

Seh also argues that the ALJ erred in assessing her credibility with respect to the severity of her symptoms and erred in assessing Seh's RFC. The court does not reach these arguments in light of its conclusion that the ALJ erred in weighing some of the medical opinions. These errors impacted the ALJ's ultimate conclusion that Seh's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." A.R. 31. Under these circumstances, the ALJ on remand should reevaluate Seh's credibility and RFC assessment.

//

//

//

//

//

### VII. CONCLUSION

For the foregoing reasons, the court grants in part Seh's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: March 28, 2019



Donna M. Ryu
United States Magistrate Judge